UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ALLEN THOMPSON,

                      Petitioner,               Case No. 2:19-cv-11089
                                               Hon. Denise Page Hood

GREGORY SKIPPER,

                      Respondent.
_____/

**OPINION AND ORDER (1) DENYING PETITION FOR WRIT OF HABEAS CORPUS, (2) DENYING CERTIFICATE OF APPEALABILITY, AND (3) GRANTING PERMISSION TO APPEAL IN FORMA PAUPERIS**

Allen Thompson, a Michigan Department of Corrections prisoner, filed this petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. The petition challenges Petitioner's Wayne Circuit Court jury trial conviction of second-degree murder. MICH. COMP. LAWS § 750.317. Petitioner was sentenced to 20 to 35 years' imprisonment.

The petition raises four claims: (1) There was constitutionally insufficient evidence presented at trial to sustain Petitioner's conviction, (2) the trial court erred in allowing admission of photographs and a video depicting Petitioner with firearms, (3) Petitioner's custodial statement to police should have been suppressed because Petitioner requested counsel

at the start of the interrogation, and (5) Petitioner is entitled to a new trial because one of the jurors was inattentive.

The Court finds that none of Petitioner's claims merit relief. The petition will therefore be denied. The Court will also deny Petitioner certificate of appealability, but it will grant permission to appeal in forma pauperis should Petitioner chose to appeal this decision.

## I. Background

The Court recites the relevant facts relied upon by the Michigan Court of Appeals, which are presumed correct on habeas review pursuant to 28 U.S.C. § 2254(e)(1). See *Wagner v. Smith*, 581 F.3d 410, 413 (6th Cir. 2009):

> Defendant's conviction arises from the shooting death of Ronald Ford III on August 23, 2015. Ford, a marijuana dealer, was shot and robbed of his marijuana during a transaction with defendant and co-defendant, Travell Henry. On the date of the offense, Henry and defendant were both residential students at the Job Corps campus in Detroit. Defendant was 16 years old. A security camera recorded them leaving the campus without permission by climbing over a perimeter fence on August 23, 2015 several hours before the shooting, and cell phone tracking demonstrated that they traveled to the east side of Detroit. Text messages between Henry and Ford were consistent with planning a drug transaction. In a statement to the police, defendant admitted that he and Henry surreptitiously left the campus in order to meet Ford to purchase marijuana but denied planning to rob or kill Ford.

> Ford was fatally shot inside his vehicle during the transaction. Two backpacks and marijuana were taken from

Ford's vehicle after he was shot. After the offense, Henry contacted a friend, Brandy Hill, who drove Henry and defendant back to the Job Corps campus. The security camera recorded them returning with the backpacks. Defendant was charged with first-degree felony murder, MICH. COMP. LAWS § 750.316(1)(b), and possession of a firearm during the commission of a felony (felony-firearm), MICH. COMP. LAWS § 750.227b. Henry was tried separately and convicted of first-degree felony murder. Defendant's first trial ended in a mistrial after the jury was unable to reach a verdict. At defendant's second trial, the jury acquitted him of first-degree felony murder and felony-firearm, but it convicted him of the lesser included offense of second-degree murder.

*People v. Thompson,* 2017 WL 3495389, at *1 (Mich. Ct. App. Aug. 15, 2017).

Following sentencing, Petitioner filed a claim of appeal. His appellate counsel filed a brief on appeal raising four claims:

I. Appellant's second-degree murder conviction must be reversed where the prosecution failed to present sufficient evidence to satisfy the constitutional due process standard of guilt beyond a reasonable doubt.

II. Appellant was denied a fair trial by the trial court's admission of irrelevant and highly prejudicial photo and video evidence of himself with guns absent any evidence when they were made or whether either gun was used in the commission of the offense for which he was on trial.

III. The trial court reversibly erred in denying the defense motion for suppression of Appellant's custodial statement, where he unequivocally requested assistance of counsel after receiving his Miranda warnings, and was thus denied his constitutional right against self-incrimination.

IV. Appellant was denied his right to a fair jury where a juror was sleeping during trial, and counsel was ineffective in failing to move for the juror's exclusion or for a mistrial.

The Michigan Court of Appeals affirmed in an unpublished opinion. *Id.* Petitioner subsequently filed an application for leave to appeal in the Michigan Supreme Court, raising the same claims that he raised in the Michigan Court of Appeals. The Michigan Supreme Court denied the application by standard form order. *People v. Thompson*, 910 N.W.2d 266 (Mich. 2018) (Table).

## II. Standard of Review

28 U.S.C. § 2254(d)(1) curtails a federal court's review of constitutional claims raised by a state prisoner in a habeas action if the claims were adjudicated on the merits by the state courts. Relief is barred under this section unless the state court adjudication was "contrary to" or resulted in an "unreasonable application of" clearly established Supreme Court law.

"A state court's decision is 'contrary to' . . . clearly established law if it 'applies a rule that contradicts the governing law set forth in [Supreme Court cases]' or if it 'confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [this] precedent.'" *Mitchell v. Esparza*, 540 U.S. 12, 15-16 (2003) (per curiam), quoting *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000).

4

"[T]he 'unreasonable application' prong of the statute permits a federal habeas court to 'grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court but unreasonably applies that principle to the facts' of petitioner's case." *Wiggins v. Smith*, 539 U.S. 510, 520 (2003) quoting *Williams*, 529 U.S. at 413. "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S.86, 101 (2011), quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004); see also *Woods v. Etherton,* No. 15-723, 2016 WL 1278478, at *3 (U.S. Apr. 4, 2016) (habeas relief precluded if state court decision is "not beyond the realm of possibility [from what] a fairminded jurist could conclude.")

### III. Discussion

<u>A. Sufficiency of the Evidence</u>

Petitioner's first claim asserts that insufficient evidence was presented at trial to sustain his conviction. After reciting the controlling Supreme Court standard, the state appellate court rejected the claim on the merits:

> There was sufficient evidence that defendant participated in an armed robbery in which murder was a natural and probable consequence. It does not appear to be disputed that defendant and Henry surreptitiously left the Job Corps campus together and that they met at a location near defendant's mother's house. Testimony was offered by an eyewitness that the armed robbery

was committed by two men wearing clothes consistent with what Henry and defendant were wearing and, as noted, defendant did not dispute that he was present. There was also evidence that defendant had access to the type of firearms that were used to kill Ford and that Henry and Ford were friends. Hill, who provided the ride back to the campus, testified that it was defendant who was carrying the black backpack when she met defendant and Henry shortly after the offense, and surveillance video from Job Corps showed that it was defendant who threw the backpack over the fence when he and Henry returned to the Job Corps campus. After the offense, defendant and Henry fled together, and defendant allowed Henry to use defendant's cell phone to contact Hill to obtain a ride back to the Job Corps campus. While in Hill's presence, the two of them discussed a man getting shot. According to Hill, the demeanor of both men was "weird," and they both seemed "paranoid" when she drove past a police precinct.

Defendant gave a statement to the police in which he admitted that he and Henry were the only persons present when Ford was shot. From this, the jury could obviously infer that either defendant or Henry shot Ford. Defendant told the police that it was Henry who was armed with a gun when the shots were fired, but the jury was free to conclude that this statement was untruthful. Defendant's conduct and continued association with Henry after the shooting also supported an inference that he was not surprised or upset that Ford was shot. Defendant did not report the incident to the police or to anyone at Job Corps, suggesting that he was not an unwilling bystander. Defendant carried the stolen backpack containing the marijuana and scale, and defendant received some of the stolen marijuana. All of these circumstances support an inference that defendant acted in concert with Henry, that he helped and encouraged Henry by choosing a location where he and Henry could flee after dealing with Ford and by approaching Ford's car with Henry, and that defendant's and Henry's conduct and joint actions showed that they shared a common intent. Thus, even if the jury concluded that Henry was the shooter, there was sufficient evidence from which a rational jury could convict him on an aiding and abetting theory as defined by *Robinson*. Under *Robinson*, the prosecution

did not need to present evidence that defendant specifically intended to aid and abet Henry in shooting Ford. *Robinson*, 475 Mich. at 15. Rather, it was required to present sufficient evidence that the murder of Ford was a natural and probable consequence of the offense that defendant did intend to aid or abet. Id. It did so, and thus the verdict was not improper.

*Thompson*, 2017 WL 3495389, at *2.

Under clearly established Supreme Court law the standard governing sufficiency of the evidence claims is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). Under AEDPA, moreover, a habeas court's "review of a state-court conviction for sufficiency of the evidence is very limited," *Thomas v. Stephenson*, 898 F.3d 693, 698 (6th Cir. 2018), because *Jackson* claims are "subject to two layers of judicial deference." *Coleman v. Johnson*, 566 U.S. 650, 651, 132 S. Ct. 2060, 182 L. Ed. 2d 978 (2012) (per curiam).

First, it is the responsibility of the jury to decide what conclusions should be drawn from the evidence admitted at trial. *Johnson*, 566 U.S. at 651 (quoting *Cavazos v. Smith*, 565 U.S. 1, 2 (2011) (per curiam)). "And second, on habeas review, 'a federal court may not overturn a state court decision rejecting a sufficiency of the evidence challenge simply because the federal court disagrees with the state court. The federal court instead may

do so only if the state court decision was 'objectively unreasonable.'" *Id.* (quoting *Smith*, 565 U.S. at 2); see also *Tanner v. Yukins*, 867 F.3d 661, 672 (6th Cir. 2017) (stating that "two layers of deference apply [to a sufficiency-of-the-evidence claim], one to the jury verdict, and one to the state appellate court").

The evidence presented at Petitioner's jury trial allowed the Michigan Court of Appeals to reasonably reject this claim. A woman near the scene of the murder was on the phone with 9-1-1 and described what she saw to the operator as it happened. A recording of the call was played for the jury under the present sense impression hearsay exception. The woman said that she saw teens near the victim's vehicle, and then she saw the victim being shot inside the car by one of the teens. She then saw the teens return to the car and shoot again. The caller described the clothing of one of the teens as army fatigue shorts and black and red Nike shoes, clothing that matched what Petitioner was seen wearing earlier that day. ECF No. 10-8, at 159, 169; ECF No. 11.

Although the caller did not identify and describe which teen shot into the vehicle, the jury could reasonably determine either that it was Petitioner or that he acted in concert with the other teen. Photographs taken a little over a week prior to the murder depicted Petitioner brandishing two handguns.

ECF No. 10-8, at 155; ECF No. 10-9, at 11. Under Michigan law, "evidence of a defendant's possession of a weapon of the kind used in the offense which he is charged is routinely determined by courts to be direct, relevant evidence of his commission of that offense." *People v. Hall*, 433 Mich. 573, 580-581 (1989).

Additionally, Petitioner's statement to police contained several statements that jury might have regarded as false. "A jury may infer consciousness of guilt from evidence of lying or deception." *People v. Unger*, 278 Mich. App. 210, 227 (2008). For the bulk of his statement, Petitioner insisted that he was on the other side of the street from the victim's car when the murder occurred. This ran contrary to the account given by the 9-1-1 caller. Later in his statement, Petitioner admitted this was false and that he was a few feet away from the victim's car just prior to the shooting. Petitioner also stated that he saw Henry punch the victim in the face right before shooting him, but this was contradicted by the medical examiner's testimony that no cut or other trauma was observed on the victim's face. Viewed most favorably to the prosecution, the jury might have determined that Petitioner lied in his statemen to police, evidencing consciousness of guilt.

After fleeing the scene, Petitioner and Henry stayed at Petitioner's mother house for a several hours. There, Petitioner smoked some of the

marijuana taken from the victim, the two teens changed clothing, and Petitioner uploaded a photograph to his Facebook page of co-defendant's cell phone displaying the victim's name and cell phone number. This was circumstantial evidence from which the jury might have inferred that even if he was not the shooter, at a minimum Petitioner acted in concert with Henry. He shared in the proceeds of the robbery, changed clothes arguably to avoid identification, and seemingly took a photograph of Henry's cell phone to maintain some form of leverage against him. Petitioner did not distance himself from Henry or report what he saw. Viewed most favorably to the prosecution, the evidence regarding Petitioner's conduct after the murder allowed the jury to find beyond a reasonable doubt that Petitioner participated in the robbery-murder.

Finally, surveillance video evidence admitted at trial indicated that it was Petitioner and not Henry who had physical possession of the victim's backpack when the two returned to the Job Corps campus. Petitioner then uploaded another photograph to his Facebook page of what appeared to be the victim's marijuana. Additional evidence retrieved from Petitioner's phone indicated that Petitioner then searched the internet for news articles regarding the murder. This conduct also allowed the jury to draw an inference

that Petitioner was an active participant in the robbery-murder, and not merely present.

Petitioner argued in state court that there are innocent explanations for his conduct before and after the crime, and no one identified him as the shooter who saw him directly assist the shooter at the time of the crime. The *Jackson* standard, however, gives little weight to a defendant's innocent explanation of evidence. Rather, it is well-settled that a jury is free to reject an innocent explanation for incriminating facts proved by the government. *United States v. Hughes*, 505 F.3d 578, 594 (6th Cir. 2007).

In sum, a rational juror could have inferred from the evidence viewed in the light most favorable to the prosecution that Petitioner was guilty of second-degree murder, and the state appellate court's decision was not contrary to, or an unreasonable application of, *Jackson*. Given the doubly deferential standard applicable to sufficiency of the evidence claims, Petitioner is not entitled to relief on his first claim.

B. Admission of Photographs and Video

Petitioner's second claim asserts that the admission of the Facebook photographs at trial depicting Petitioner with firearms, see ECF No. 10-10, Page.ID.128, 131, was erroneous. The Michigan Court of Appeals rejected the claims as follows:

The Facebook photographs and video from defendant's cell phone were relevant because they showed that defendant had access to the type of weapon used to kill Ford. Given that no weapons were ultimately recovered and that there was no other evidence suggesting that defendant or Henry had access to the weapons used in the offense the probative value was especially strong. The evidence was in no way cumulative, and it directly tended to prove the fact for which it was offered, to show defendant had access to a weapon. See *People v. Blackston*, 481 Mich. 451, 462 (2008) (stating that "[a]ssessing probative value against prejudicial effect requires a balancing of several factors, including ... whether the evidence is needlessly cumulative [and] how directly the evidence tends to prove the fact for which it is offered"). Defendant argues that the photos were unfairly prejudicial under MRE 403 because they "portrayed him as a gangster." However, we conclude that any risk of prejudice caused by the admission of these photographs and the video was minimal in comparison to the strength of their probative value. Although defendant is holding guns in the Facebook photos, he is not demonstrating any intent to use the guns. He is not holding the gun in the video. Therefore, the probative value of the evidence was not substantially outweighed by the danger of unfair prejudice. Defendant has not established that the trial court abused its discretion in admitting this evidence.

*Thompson*, 2017 WL 3495389, at *3.

The admission of the photos did not contravene any constitutional right clearly established by Supreme Court law. Alleged trial court errors in the application of state evidentiary law are generally not cognizable as grounds for federal habeas relief. See *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) ("it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions"); *Serra v. Michigan Dep't of Corrections*, 4 F.3d 1348, 1354 (6th Cir. 1993). An error in state procedure

or evidentiary law does not rise to the level of federal constitutional claims warranting habeas relief, "unless the error renders the proceeding so fundamentally unfair as to deprive the petitioner of due process under the Fourteenth Amendment." *McAdoo v. Elo*, 365 F.3d 487, 494 (6th Cir. 2004) (quoting *Estelle*, 502 U.S. at 69-70); see also *Wynne v. Renico*, 606 F.3d 867, 871 (6th Cir. 2010) (citing *Bey v. Bagley*, 500 F.3d 514, 519-20 (6th Cir. 2007)).

To the extent that Petitioner asserts that the trial court erred in admitting the testimony under Michigan law, he merely alleges a violation of state law which does not justify federal habeas relief. State courts are the final arbiters of state law and federal courts will not intervene in such matters. *Lewis v. Jeffers*, 497 U.S. 764, 780 (1990); *Bradshaw v. Richey*, 546 U.S. 74, 76 (2005). Habeas relief does not lie for perceived errors of state law. *Estelle*, 502 U.S. at 67-68.

With regard to federal law, the admission of the evidence did not render Petitioner's trial fundamentally unfair. The fact that approximately a week before the murder Petitioner brandished weapons similar to the one used to murder the victim was relevant to establish that he had access to a firearm. There was no weapon recovered from the scene, nor were the weapons Petitioner was depicted brandishing ever discovered. Given the nature of the

crime, the photographs and the video were not of minimal probative value, but rather were highly relevant to show Petitioner's identity, state of mind, and that he had access to the type of weapon used to murder the victim. The claim is therefore without merit.

C. Admission of Petitioner's Statement to Police

Petitioner's third claim asserts that his *Miranda* rights were violated when the police interrogated him after he requested counsel. The trial court held an evidentiary hearing on the claim, after it which it denied Petitioner's motion to suppress his statement. ECF No. 10-4, 10-5. The Michigan Court of Appeals thereafter accepted the findings of facts made by the trial court, and it rejected the claim on the basis that Petitioner did not make an unequivocal request for counsel prior to making his statement to police officers:

> At the beginning of the police questioning, which was scheduled at defendant's request, defendant indicated that his mother might come with an attorney, but he did not know if she would. Officer Ford asked defendant if he was "saying you don't want to talk to us without a lawyer," and told defendant, "It's up to you." Ford then gave defendant and opportunity to call his mother. Defendant talked to his parents, and specifically asked his mother if she was getting an attorney. A man, presumably defendant's father or stepfather, told him not to say anything "extra," and then Officer Manzella sought confirmation whether defendant was "okay to talk to us?" Ford then read defendant his rights, including the advice that he could decide at any time that he wanted a lawyer. Defendant read the waiver of rights form aloud. Defendant said nothing that could be construed as a

request for counsel. Defendant apparently intended to rely on his parents' guidance, and he opted to speak to the officers without counsel present based on his parents' statements. Nothing in the recorded interview suggests that the officers tried to influence defendant's decision or that defendant was somehow prevented from making an unequivocal assertion of his right to counsel. On the contrary, the officers gave defendant an opportunity to contact his parents to determine whether they had arranged for counsel to be present, and that conversation resulted in defendant opting to proceed without counsel. Therefore, the trial court did not err in denying defendant's motion to suppress his statement.

*Thompson*, 2017 WL 3495389, at *4.

The Fifth Amendment protects an accused from compulsory self-incrimination. The prohibition against compelled self-incrimination requires that a custodial interrogation be preceded by advice that the suspect has the right to an attorney and the right to remain silent. See *Miranda v. Arizona*, 384 U.S. 436, 479 (1966); see also *Dickerson v. United States*, 530 U.S. 428, 432 (2000) ("*Miranda* and its progeny . . . govern the admissibility of statements made during custodial interrogation in both state and federal courts."). "[T]he term 'interrogation' under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980).

15

When a suspect has invoked the right to counsel during a custodial interrogation, the suspect may not be "subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police." *Edwards v. Arizona*, 451 U.S. 477, 484-85 378 (1981). The request for counsel must be express and unambiguous. *Davis v. United States*, 512 U.S. 452, 459 (1994). If a suspect's reference to counsel is ambiguous or equivocal, the police have no obligation to stop questioning the suspect. *Id*. A suspect must sufficiently articulate his or her desire for counsel so that a reasonable police officer under the circumstances would understand the statement to be a request for an attorney. *Id*.

In the present case, the entire interaction between police and Petitioner was videotaped. That tape was played for the trial court, and both the officer involved in the interrogation and Petitioner testified regarding the interview. After the hearing the trial court made findings of fact as to what occurred during the interrogation. Those factual findings are presumed correct on habeas review, and Petitioner had not attempted to rebut them by clear and convincing evidence. See 28 U.S.C. § 2254(e)(1):

> [THE COURT]: There was one point when Mr. Thompson does make a short statement including the word lawyer, but it was not a – it's hard to hear exactly what he's saying, but it was clearly not an equivocal request for a lawyer and the Court comes to that

conclusion from looking at all the dialogue that occurred before and the dialogue that occurred after because after that they asked for clarification from Mr. Thompson, whether or not he wanted to talk to him without a lawyer saying that it was up to him and asking him if he wanted to talk without a lawyer and Mr. Thompson indicated he was willing to talk to them and willing to talk to them without a lawyer and then they went and they advised him of his *Miranda* rights even though the officer – he came in there voluntarily and the officers let him go afterwards, they advised him of his *Miranda* rights again pursuant to the Constitutional Rights Certificate of Notification form saying that, I have the right to remain silent and that I do not have to answer any questions put to me or make any statements. Any statements I make or anything I say will be used against me in a court of law.  I have the right to an attorney/lawyer present before or during – and during the time I answer any questions or make any statements. If I cannot afford an attorney/lawyer one will be appointed for me without cost by the Court prior to any questioning. I can decide at any time to exercise my rights and not to answer any questions or make any statements, and then the last line which Mr. Thompson read out loud, I understand – on the tape, I understand these are my rights under the law. I have not been threatened or promised anything and I now desire and agree to answer any questions put to me or make a statement, and it's dated and signed by Mr. Thompson and then again later on in the statement he says, he was asked, did you ask to change your story? Answer: Yes. Question: You requested to talk without a lawyer? Answer: Yes. There was discussions about a lawyer during the first ten minutes of the interview, questions that I suppose were raised by Mr. Thompson, raising the issue cause he didn't know if his mother had hired a lawyer, his mother wanted to wait for a lawyer, but the officers asked questions to try to clarify what it was he wanted to do, whether or not he wanted to talk with 'em without a lawyer or not and he never made an equivocal statement that, I want a lawyer—

MR. WOODYARD:  Did you say equivocal or unequivocal?

> THE COURT:  He did not make an unequivocal statement. Thank you.
>
> MR. WOODYARD:  Thank you.
>
> THE COURT:  He never made an unequivocal statement of, I want my lawyer, or, I want a lawyer, or, that I won't talk to you without a lawyer.  Every statement that he made with regard to a lawyer had to do with a question or it was at best equivocal. I don't even know if it amounted to that and the officers gave him an opportunity to try and understand what his position was simply because he was mentioning the word lawyer and not knowing whether his mother had hired a lawyer or wanted him to wait for a lawyer and he chose to speak to the officers without a lawyer. So the Court finds that the Defendant did not ask for a lawyer, did not exercise his constitutional right for a lawyer and made a voluntary, knowing and intelligent waiver of his *Miranda* rights and voluntarily spoke with the police. So the Court is going to deny the Defendant's motion to suppress his statement.

ECF No. 10-5, at 11-13.

Petitioner never made an unequivocal request for counsel. He said something that was apparently unclear on the tape about his mother perhaps telling him to wait to speak with police until she hired a lawyer for him, which is different from Petitioner himself telling police that he did not want to speak with them until he had counsel. When faced with the information that Petitioner's mother was perhaps hiring an attorney, the officer asked Petitioner for clarification whether Petitioner was invoking his right to counsel. Petitioner thereafter decided to waive his rights and make a statement that he viewed as exculpatory.

These facts are not too dissimilar to the facts of *Davis*, where the Supreme Court concluded that the defendant's statement "Maybe I should talk to a lawyer" was not an unequivocal request for counsel requiring the police to stop questioning. *Davis*, 512 U.S. at 462. Other cases have found similar language to be too equivocal to amount to an unambiguous request to speak to counsel. See *United States v. Amawi*, 695 F. 3d 457, 485 (6th Cir. 2012) (defendant's statements during *Miranda* warning, that "I'm going to wait" and asking "is there a lawyer on board [this plane]" were neither clear nor unequivocal invocation of the right to remain silent); *Rogers v. Kerns*, 485 F. App'x. 24, 31 (6th Cir. 2012) (habeas petitioner's inquiry after signing his *Miranda* waiver form and immediately before confessing "I can't write this with a lawyer or anybody[?]," was not an unequivocal invocation of the right to counsel); *Cornelison v. Motley*, 395 F. App'x. 268, 274 (6th Cir. 2010)(habeas petitioner's comment "What if I want my lawyer present first?" too ambiguous to require the police to terminate their interrogation, particularly where petitioner proceeded afterward to fill out waiver form and then indicated he wished to speak with the police); *Ledbetter v. Edwards*, 35 F. 3d 1062, 1070 (6th Cir. 1994) (defendant's statement during police interrogation, that "it would be nice" to have an attorney, was too ambiguously worded to require police to stop questioning defendant).

When Petitioner mentioned his mother's statement, the detectives did not ignore it, but rather, stopped to ask him questions seeking to clarify whether he was invoking his right to counsel. When a suspect makes such an ambiguous or equivocal statement about counsel, "it will often be good police practice for the interviewing officers to clarify whether or not he actually wants an attorney." *Davis*, 512 U.S. at 461. It was thus proper for the officer to continue questioning Petitioner for the sole purpose of determining whether he wished to consult with an attorney. *Id.*, at 462. After being asked whether he was requesting counsel, Petitioner indicated that he wanted to continue to speak with the police.

In light of the facts of this case and the cases mentioned above with roughly similar equivocal statements, Petitioner has failed to demonstrate that the Michigan Court of Appeals rejection of this claim "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington*, 562 U.S. at 103.

## D. Inattentive Juror

Petitioner's final claim asserts that he is entitled to a new trial because one of the jurors appeared to fall asleep during trial.

> The trial court in this case made more meticulous efforts to investigate the juror's perceived inattentiveness than in *Dunigan*.

> After inquiring about the juror's status, the trial court made detailed notes regarding instances when the juror rubbed his forehead, closed his eyes or looked downward, or failed to look at exhibits. The court informed the juror during trial that he needed to focus on the trial and give it "all hundred and ten percent," and the juror indicated that he understood. The trial court and the attorneys subsequently agreed that the juror appeared more attentive. As in *Dunigan*, 299 Mich. App. at 586, "there is no indication of what, if any, testimony the juror missed." These circumstances preclude any inference that defendant was prejudiced by the juror's perceived inattentiveness or trial counsel's failure to move for a mistrial or pursue other action.

*Thompson*, 2017 WL 3495389, at *5.

A new trial was not required based on these circumstances. A trial court is not required to remove a juror who has slept, and the court has considerable discretion in handling the matter. See, e.g., *United States v. Freitag*, 230 F.3d 1019, 1023 (7th Cir. 2000); see also *United States v. Newman*, 982 F.2d 665, 670 (1st Cir. 1992). A sleeping juror does not violate a defendant's due process rights unless the defendant can show he was prejudiced to the extent that he did not receive a fair trial. See *Freitag*, 230 F.3d at 1023. Petitioner's pointing out that a single juror that at one point may have had trouble staying awake does not by itself establish such prejudice. *United States v. Fernandez-Hernandez*, 652 F.3d 56, 75 (1st Cir. 2011) (citing *Freitag*, 230 F.3d at 1023). Petitioner has failed to demonstrate that he suffered actual prejudice arising from the incident.

As none of Petitioner's claims merit relief, the petition will be denied.

## IV. Certificate of Appealability

Before Petitioner may appeal, a certificate of appealability must issue. See 28 U.S.C. § 2253(c)(1)(a); Fed. R. App. P. 22(b). A certificate of appealability may issue "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). When a court denies relief on the merits, the substantial showing threshold is met if the petitioner demonstrates that reasonable jurists would find the court's assessment of the claim debatable or wrong. *See Slack v. McDaniel*, 529 U.S. 473, 484-85 (2000). Having undertaken the requisite review, the court concludes that jurists of reason would not debate the Court's decision with respect to any of Petitioner's claims because they are all devoid of merit.

The Court will, however, grant permission to appeal in forma pauperis because an appeal of this decision can be taken in good faith. 28 U.S.C. § 1915(a)(3).

## V. Conclusion

Accordingly, the Court 1) **DENIES** the petition for a writ of habeas corpus, 3) **DENIES** a certificate of appealability, and 3) **GRANTS** permission to appeal in forma pauperis.

**SO ORDERED**.

s/Denise Page Hood
Hon. Denise Page Hood
United States District Judge

Dated:  July 30, 2020